DAN SIEGEL, SBN 56400
ANNE BUTTERFIELD WEILLS, SBN 139845
EMILYROSE JOHNS, SBN 294319
SIEGEL, YEE & BRUNNER
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698

Attorneys for Plaintiffs
CLARK SULLIVAN, JAMES BLAIR,
TOAN NGUYEN, ARIKA MILES,
and ADAM BREDENBERG

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARK SULLIVAN, JAMES BLAIR, TOAN NGUYEN, ARIKA MILES, and ADAM BREDENBERG,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>CITY OF BERKELEY and SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT,<br><br>　　　　　Defendants. | Case No. 3:17-cv-06051-WHA<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES**<br><br>**(Civil Rights)**<br><br>**Demand for Jury Trial** |

## INTRODUCTION

1.　Berkeley is home to nearly 1,000 homeless residents.

2.　The 2017 Point in Time ("PIT") count, conducted once every two years as required by the U.S. Department of Housing and Urban Development, showed a 23 percent increase in homelessness from the 2009 count. Of those currently homeless,

two thirds live without shelter.[1]

3. Between 2015 and 2017, the chronically homeless population in Berkeley increased 29 percent, according to the PIT count.

4. The City of Berkeley has consistently failed to offer enough shelter beds for its homeless residents.

5. As of 2013, the City of Berkeley had only 189 emergency shelter beds and 157 transitional housing beds.[2]

6. Although Berkeley has increased the amount of shelter beds since 2013, the increase has been minimal and Berkeley's homelessness crisis has only increased.

7. Berkeley created a homeless coordinated entry program, known as the "HUB," in January 2016 which centralized the referral to services and housing for homeless Berkeley residents. Between its launch on January 5, 2016 and the 2017 PIT count at the end of January 2017, the HUB was able to house only 46 individuals and place 59 high-needs individuals in shelters and transitional housing, despite screening 1, 823 people in need of services.

8. During the rise of Berkeley's homelessness crisis, the Berkeley City Council passed ordinances that sought to criminalize the condition of being homeless. Combined with the lack of available shelter beds, homeless residents of Berkeley risk daily arrest simply for being homeless.

9. Despite these efforts, the Berkeley City Council did acknowledge its shelter bed shortage. In light of the abysmal growth rate of Berkeley's homeless population, the Berkeley City Council declared a Homeless Shelter Crisis on January 19, 2016, pursuant to California Government Code Section 8698 *et seq.* This allows the city to designate "public facilities" including parks, schools, and vacant lots, for occupation by persons needing shelter. It also relaxes the city's exposure to liability in the

---

[1] http://everyonehome.org/wp-content/uploads/2016/02/BERKELEY_5-Final-1.pdf
[2] http://www.berkeleyside.com/wp-content/uploads/2016/06/Berkeley-Final-CAS-Report-Submitted-090514.pdf

designated areas and relaxes regulations prescribing standards of housing, health and safety.

10. On information and belief, the City has yet to designate any public facilities for this purpose.[3]

11. On November 15, 2016, Berkeley City Council renewed the state of emergency for another year.

12. On October 13, 2017, California Governor Edmund G. Brown Jr. declared a state-wide State of Emergency due to an outbreak of Hepatitis A in California homeless encampments.[4]

13. The First They Came for the Homeless ("FTCftH") encampment is an intentional community of homeless Berkeley residents that was formed in 2015. It publicly opposes Berkeley's increasing efforts since 2015 to criminalize the condition of homelessness.

14. Members of FTCftH have been cited, arrested, and jailed, for sleeping in public.

15. Members of FTCftH have been evicted from many locations throughout Berkeley.

16. Each time they are evicted, the City of Berkeley comes before dawn, hurries residents out of the encampment allowing them to take only what they can carry, with no regard to physical or mental disability, and disposes of everything that is left over, including any unattended tents.

17. The City makes no efforts to give residents receipts for what is taken, inventory what is collected, or store property in a manner that protects it from the elements.

---

[3] The City of Berkeley is building a "Pathways Project" to house 50 homeless residents, but it is not clear that the land there is designated under this statute.
[4] http://abcnews.go.com/Health/hepatitis-california-outbreak-triggers-state-emergency/story?id=50513882

*Sullivan v. BART,* No. 3:17-cv-06051-WHA
First Amended Complaint - 3

18. Residents are given no information on where they can go to find shelter, beyond contacting the HUB, and are given no direction on where they may be able to lawfully camp.

19. After several years of targeted evictions from public spaces throughout Berkeley, the FTCftH encampment formed in its current location on a parcel of land on the west side of the BART tracks at the Oakland/Berkeley Boarder that the San Francisco Bay Area Rapid Transit District ("BART") claims to own.

20. The camp is known at the "Here/There" camp due to its position around an art instillation on the land with signs reading "HERE" and "THERE."

21. On Saturday, October 21, 2017, BART posted notices around the FTCftH camp and another camp on the east side of the BART tracks declaring its intent to evict residents in 72 hours.

22. On Sunday, October 22, 2017, BART posted a subsequent notice that told residents to contact the "HUB" or Berkeley Homeless Coordinated Entry System to get shelter or housing.

23. BART and the City of Berkeley know that the HUB does not have sufficient resources to house Berkeley's homeless residents.

24. Despite this, BART, with the assistance of the City of Berkeley, intends to evict the peaceful encampment.

25. Residents filed an emergency petition for a Temporary Restraining Order ("TRO") to prevent BART from executing the eviction.

26. On October 24, 2017, the Court issued a TRO until plaintiffs could be heard on October 31, 2017.

27. Pursuant to their noticed intent, BART police, Berkeley police, City of Berkeley Parks and Waterfront workers, and BART workers arrived at the neighboring camp on the east side of the BART tracks at 5 a.m. on October 25, 2017.

28. As plaintiffs have experienced in the past, the residents of that

encampment were hurried out of the encampment, took only what they could carry with no regard to physical or mental disability, and the items that remained were disposed of with no inventory taken or receipts issued.

29. If evicted, residents of the FTCftH encampment can expect no better treatment. As any other homeless person in Berkeley, they will have no place to go for shelter and will be forced to find another parcel of land to reside on.

30. If that land is in the City of Berkeley, residents are guaranteed to face many more evictions.

## JURISDICTION AND VENUE

31. This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (claims arising under the U.S. Constitution) and § 1343(a)(3) (claims brought to address deprivations, under color of state authority, of rights, privileges, and immunities secured by the U.S. Constitution), and 42 U.S.C. § 1983.

32. The state law claims in this action are so related to claims in the action within original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. The Court's jurisdiction over these claims is invoked under 28 U.S.C. § 1367.

33. Venue is proper in the United State District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) because the defendants are located in the Northern District of California and § 1391(b)(2) because all of the acts and/or omissions complained of herein occurred within the Northern District of California.

## PARTIES

### Plaintiffs

34. At all times relevant hereto, plaintiff Clark Sullivan was a homeless resident of Alameda County and member of the First They Came for the Homeless encampment.

35. At all times relevant hereto, plaintiff James Blair was a homeless resident of Berkeley. Plaintiff James Blair is member of the First They Came for the Homeless encampment and has been since January 2017.

36. At all times relevant hereto, plaintiff Toan Nguyen was a resident of Oakland or a homeless resident of Berkeley. Plaintiff Toan Nguyen is a member of the First They Came for the Homeless encampment and has been since October 2017.

37. At all times relevant hereto, plaintiff Arika Miles was a homeless resident of Berkeley. Plaintiff Arika Miles is a member of the First They Came for the Homeless encampment and has been since January 2017.

38. At all times relevant hereto, plaintiff Adam Bredenberg was a homeless resident of Berkeley and member of the First They Came for the Homeless encampment.

### Defendants

39. At all times relevant hereto, defendant City of Berkeley was a municipal corporation, duly organized and existing under the laws of the State of California. Under its authority, defendant City of Berkeley operates the Berkeley Police Department and employs its officers.

40. At all times relevant hereto, defendant San Francisco Bay Area Rapid Transit District was a public transportation agency run by a Board of Directors elected by the public and representing each district through which the Bay Area Rapid Transit trains run.

### FACTUAL ALLEGATIONS

41. The First they Came for the Homeless ("FTCftH") encampment was established in 2015 as Berkeley City Council was passing ordinances that, in the opinion of the camp residents, had the effect of criminalizing homelessness.

42. The encampment established themselves in prominent places near City administration buildings and the provider of the City's coordinated homeless services

to demand respite in the form of a City-sanctioned encampment.

43. Members of the encampment regularly attend City Council meetings and write op-eds criticizing the City for its mismanagement of the homelessness crisis.

44. Meanwhile, FTCftH established a set of rules that residents in the encampment must follow in order to stay in the encampment. This includes remaining hard drug and alcohol free and participating in consensus decision making and non-violent conflict resolution.

45. On January 5, 2016, the City of Berkeley established a Homeless Coordinated Entry System known as the "HUB" that was meant to centralize services for the homeless and encourage greater success in housing homeless Berkeley residents.

46. The City poured millions of dollars into the HUB, which after a year had performed intakes for 1,823 people yet housed only 46.

47. Despite that abysmal service rate, the City of Berkeley evicted FTCftH from each encampment it established and ushered them to the HUB to get housed.

48. For those three winter months, and in response to the encampment's stinging criticisms of Berkeley's handling of the homelessness crisis, Berkeley began an aggressive campaign of evictions.

49. During those months, the City of Berkeley evicted the FTCftH encampment at least 12 times. They were evicted on or about the following dates from approximately the following locations:

    a. Friday, October 7, 2016 from the sidewalk in front of the HUB at 1901 Fairview Avenue.

    b. Tuesday, October 18, 2016 from the median strip at Adeline Street and Ward Street.

    c. Wednesday, October 19, 2016 from the Adeline Street and Shattuck "triangle."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      d.      Friday, November 4, 2016 from Fairview Street and Adeline Street near the HUB.

      e.      Monday, November 7, 2016 from the steps of Berkeley City Hall.

      f.      Thursday, November 17, 2016, from the lawn South of Berkeley City Hall.

      g.      Friday November 18, 2016, from Civic Center Park at Milvia Street and Allston Street.

      h.      Friday, December 2, 2016 from the North lawn of Berkeley City Hall.

      i.      Wednesday, December 21, 2016 from Adeline Street and Oregon Street.

      j.      Wednesday, December 21, 2016 from the lawn near Berkeley's former City Hall building on Martin Luther King Jr. Way and Allston Street.

      k.      Thursday December 22, 2016 from University Street and West Street near the Ohlone path.

      l.      Friday, January 6, 2017 from the median on Shattuck between Vine St. and Rose St.

50. Prior to some evictions, the residents were provided posted notice of the date by which they needed to move, but they were provided no opportunity to be heard and advocate for their right to remain in place. Other times they were provided no notice at all.

51. The winter of 2016 experienced many rain storms and cold weather.

52. Each eviction was brutal due to these weather conditions.

53. When the City of Berkeley performs encampment evictions, they are done callously and without sufficient procedures for protecting property that the residents may not be able to move without assistance.

---

*Sullivan v. BART,* No. 3:17-cv-06051-WHA
First Amended Complaint - 8

54. During the winter 2016 evictions, some FTCftH residents and allies were arrested. One former resident, Mike Zint, was arrested on November 17, 2016, for not packing his belongings fast enough. He has COPD and emphysema and suffered a respiratory attack at 5 a.m. when he was awoken by the police. He was given 10 minutes to pack his belongings and when he demanded more time because of his respiratory attack, he was arrested.

55. Disabilities are not evaluated or accommodated, despite some residents having known or visible disabilities.

56. Plaintiff Clark Sullivan is wheelchair bound. He was never offered assistance from the City of Berkeley to move his property. He was never provided assistance in getting his property back.

57. During each eviction, Berkeley Police would section off the block with caution tape and would not let community members into the encampment to assist residents with packing or carrying items away.

58. The City of Berkeley collects anything that appears unattended including tents and clothing. They also dispose of anything that evicted residents cannot carry. They put these items in a dumpster and do not properly store them so that they can be collected and used when retrieved.

59. City employees even dispose of disability appliances. One former encampment resident, Brett Schnaper, who is physically disabled, had his brace boot, osteo-shoes, ankle assist, and cane disposed of after one of the evictions that occurred on December 21, 2016, with no regard to his medical need for those devices. He was not able to retrieve the devices and suffered from pain and mobility issues as a result.

60. After the November 17, 2016, eviction, the City of Berkeley collected residents' belongings and stored them in a dumpster, outside, at the Transfer Station in Berkeley. When residents went to retrieve their items, they found them tangled in with other people's items and with garbage. The items had also been soaked through due to

heavy rain.  The items in the dumpster included identification cards and medications.

61. Plaintiffs Sullivan lost personal property during evictions and both plaintiffs Sullivan and Adam Bredenberg lost shared property during evictions.

62. As the property that Berkeley discards or stores improperly included tents, sleeping bags, winter coats, and tarps, residents spent nights that winter exposed to the elements until community members could donate those items. This put them at severe risk of weather-induced illnesses.

63. The residents have been safe from these violations of their constitutional and statutory rights for ten months since establishing the Here/There encampment.

64. Since establishing themselves at the Here/There encampment, residents have garnered support from their housed neighbors.

65. Community groups such as Friends of Adeline purchase necessary items for the encampment from time to time.

66. In the height of a state-wide Hepatitis A outbreak, Friends of Adeline purchased a porta-potty and hand-washing station for the encampment when the City refused to do so. This is a life-saving measure that helps stabilize the encampment.

67. Before June 2017, the city did not receive a complaint about the encampment from housed neighbors. After an encampment moved in on the east side of the tracks, housed community members began complaining but FTCftH was not the cause of the complaints.

68. At the encampment, members have to abide by a set of rules. They are invited to perform chores around the encampment to ensure it is well-kempt and accessible, with able-bodied members taking on more responsibility for camp upkeep. Decisions about camp rules and camp members are made by graduated consensus, and residents are subject to a three-strikes and you're out policy.

69. In the unfortunate event of an encampment member having to be removed, the remaining encampment members help the individual pack up all of their

belongings and help them move, in the most supportive way that they are able.

70. The encampment is violence and serious crime-free.

71. On October 21, 2017, at or around 4 p.m., both the FTCftH encampment and the east encampment were served with a notice that the BART police would enforce an eviction in 72 hours.

72. The notice which bore a BART logo alleged that residents were trespassing on private property in violation of California Penal Code section 602(m).

73. A subsequent notice posted on October 22, 2017, bearing a BART police logo told residents to leave immediately or risk arrest for violating California Penal Code section 647(e).

74. Residents of FTCftH have been arrested for violations of California Penal Code section 647(e) before and risk arrest for that every day as the vague language of the statute appears to prohibit sleeping in public.

75. On information and belief, BART had been planning the October 24, 2017, eviction for six weeks. Despite that, they gave residents only 72 hours, over a weekend when the HUB is not open, to move or risk losing their belongings or being arrested.

76. BART cited complaints by neighbors, for which the residents of FTCftH encampment were not able to defend them selves in any hearing.

77. BART will use the City of Berkeley and the Berkeley police department to enforce the eviction on the FTCftH encampment.

78. On October 25, 2017, BART police and employees and Berkeley Police and city employees evicted the encampment on the east of the tracks. They arrived between 4:30 and 5 a.m. and all residents were gone by 6:30 a.m. There was innumerable property remaining at the encampment after 6:30 a.m., and BART and City workers removed the property using pitch forks. They did not inventory the items or label them. The residents' belongings were discarded in dumpsters that were hauled away by trucks with BART insignia.

79. On information and belief, no resident of the encampment was offered housing. Many residents moved to the aquatic park.

80. FTCftH expects that their eviction will be carried out in this same way, which resembles every eviction they have ever suffered.

81. Plaintiffs Sullivan, Bredenberg, James Blair, Toan Nguyen, and Arika Miles fear that an eviction would be destabilizing.

82. At the camp, each is able to contribute to a community that provides meaning in their lives, enjoys the safety of a well-self-policed community, and enjoys the support of a housed community that provides life-saving services such as port-a-potties and hand-washing stations.

83. There is a substantial risk of irreparable harm including risk of injury, illness, and permanent loss of property just before the winter months if BART is allowed to evict residents of FTCftH.

## CLASS ALLEGATIONS

84. The named individual Plaintiffs bring this action on behalf of themselves and on behalf of a class of all those similarly situated pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

### Definition

85. Plaintiffs seek to represent a class of all present and future residents of the encampment known as First They Came for the Homeless, an intentional community of homeless individuals.

### Numerosity

86. The class is so numerous that joinder of all members is impractical.

87. Plaintiffs are informed and believe, and based thereon allege, that there are anywhere from twenty to thirty members of First they Came for the Homeless at any given time. Due to the nature of homelessness and the rules of the intentional

community, membership fluctuates such that joining all potentially impacted individuals is impracticable. It is unknown how many additional 664 unsheltered homeless Berkeley residents and additional future homeless residents would seek to join First They Came for the Homeless if the encampment were permitted to remain in place. Moreover, members of the class who may suffer future injury are not capable of being identified at this time, as the class includes future members of the encampment.

### Common Questions of Law and Fact

88. Common questions of law and fact predominate, and include: (a) whether defendants reasonably accommodate the known and perceived disabilities of plaintiffs and the putative class during enforcement actions; (b) whether defendants' policies, practices and conduct of seizing and destroying the personal property of individuals who are homeless, without providing sufficient or any prior notice or a meaningful opportunity to retrieve vital personal possessions before they are destroyed violated and continue to violate the class members' constitutional rights against unreasonable seizure; (c) whether these same policies, practices and conduct violated and continue to violate the class members' constitutional rights to due process; (d) whether the policies, practices and conduct of defendants violated and continue to violate the class members' federal constitutional rights to be free from cruel and unusual punishment; (e) whether the City of Berkeley targets the members of the encampment for enforcement actions based on the content of their speech; (f) whether injunctive relief should issue to enjoin the policy, practice and conduct of the defendants' agents.

### Typicality

89. The claims of the class representatives are typical of those of the class members with respect to the constitutionality and legality of the defendants' policies,

practices and conduct at issue here. The prosecution of individual actions against the defendants by individual class members would create a risk of inconsistent and varying adjudications, which would result in variable standards of conduct for defendant.

### Adequacy of Representation

90. The named plaintiffs are members of the proposed class and will fairly and adequately represent and protect the interests of the class. Plaintiffs intend to prosecute this action rigorously in order to secure remedies for the entire class. Counsel of record for plaintiffs are experienced in federal civil rights litigation and class actions.

**FIRST CLAIM FOR RELIEF**
**FAILURE TO REASONABLY ACCOMMODATE IN VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF 1990**
(By plaintiffs against all defendants)
(42 U.S.C. § 12132.)

91. Plaintiffs incorporate by reference paragraph 1 through 90 above as though fully set forth herein.

92. By virtue of the foregoing, defendants failed to reasonably accommodate plaintiffs' and the putative class' disabilities during prior evictions. Defendants have no plan or intention of accommodating plaintiffs' and the putative class' disabilities in future eviction actions. As a result of such failure, plaintiffs did suffer injury and indignity at the hand of defendants and are at substantial risk of suffering injury and indignity at the hand of defendants.

**SECOND CLAIM FOR RELIEF**
**DENIAL OF DUE PROCESS IN VIOLATION OF THE FOURTH AMENDMENT**
(By plaintiffs against all defendants)
(42 U.S.C. § 1983)

93. Plaintiffs incorporate by reference paragraphs 1 through 92 above as though fully set forth herein.

94. By virtue of the foregoing, defendants punish plaintiffs by destroying their property and forcing them to move in poor weather conditions based only on

complaints from housed community members, without offering plaintiffs or the putative class an opportunity to be heard, depriving plaintiffs and the putative class their right under the Fourth Amendment to the United States Constitution to be free of punishment without due process.

### THIRD CLAIM FOR RELIEF
### UNLAWFUL SEIZURE IN OF PROPERTY IN VIOLATION OF THE FOURTH AMENTMENT
(By plaintiffs against all defendants.)
(42 U.S.C. § 1983)

95. Plaintiffs incorporate by reference paragraphs 1 through 94 above as though fully set forth herein.

96. Defendants violated plaintiffs' Fourth Amendment rights to be free from unreasonable seizure of their property by confiscating and then destroying plaintiffs' property without sufficient warrant and at times under threat of arrest if plaintiffs reentered the cordoned off encampment. Defendants' unlawful actions, through the conduct of its employees from the Berkeley and BART police departments and other city departments was done with the specific intent to deprive plaintiffs of their constitutional rights to be secure in their property.

97. Plaintiffs are informed and believe that the acts of the defendants' employees and agents were intentional in failing to protect and preserve their property and that, at minimum, the defendants were deliberately indifferent to the likely consequence that the property would be seized and destroyed unlawfully, based on the past circumstances of similar constitutional and statutory violations of the law.

98. As a direct and proximate consequence of the acts of defendants' agents and employees, plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.

## FOURTH CLAIM FOR RELIEF
## CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT
(By plaintiffs against all defendants.)
(42 U.S.C. § 1983)

99. Plaintiffs incorporate by reference paragraphs 1 through 98 above as though fully set forth herein.

100. Poverty, unemployment, untreated mental and physical illness and the City's failure to provide adequate shelter space often force plaintiffs and other homeless individuals to sleep in public places.

101. Although Plaintiffs are homeless and have no way to comply with California Penal Code section 647(e) because they must sleep outdoors, defendants have cited, arrested, or threatened Plaintiffs for sleeping in public places in Berkeley. Defendants are punishing plaintiffs and other homeless individuals based on their status as homeless persons.

102. Defendants' actions that penalize Plaintiffs for their homeless status constitute cruel and unusual punishment in violation of Plaintiffs' well established rights under the Eighth Amendment of the United States Constitution as incorporated in, and applied to the states through, the Fourteenth Amendment.

103. Plaintiffs seek redress for Defendants' violation of their right to be free from cruel and unusual punishment.

## FIFTH CLAIM FOR RELIEF
## RETALIATION AGAINST PROTECTED ACTIVITY IN VIOLATION OF THE FIRST AMENDMENT
(By plaintiffs against the all defendants)
(42 U.S.C. § 1983)

104. Plaintiffs incorporate by reference paragraphs 1 through 103 above as though fully set forth herein.

105. By virtue of the foregoing, defendants targeted plaintiffs and the putative class for evictions in harsh winter months based on the content of their speech and their political engagement.

## DECLARATORY RELIEF ALLEGATIONS

106. Plaintiffs incorporate paragraphs 1 through 105 as though fully set forth herein.

107. A present and actual controversy exists between Plaintiffs and Defendants concerning their rights and respective duties. Plaintiffs contend that Defendants violated their rights and the rights of the Class under federal anti-discrimination law and constitutional law. Plaintiffs are informed and believe and based thereon allege that Defendants deny these allegations. Declaratory relief is therefore necessary and appropriate.

## INJUNCTIVE RELIEF ALLEGATIONS

108. Plaintiffs incorporate paragraphs 1 through 107 as though fully set forth herein.

109. No plain, adequate, or complete remedy at law is available to Plaintiffs and the Class to redress the wrongs addressed herein.

110. If this Court does not grant the injunctive relief sought herein, Plaintiffs and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully pray that this Court:

(1) Certify the proposed Class;

(2) Enter an order declaring that defendants have violated plaintiffs constitutional and statutory rights;

(3) Issue preliminary and permanent injunctions restraining defendants and their officers, agents, employees, successors, and any other persons acting in concert with them from violating plaintiffs' constitutional and statutory rights during interactions with plaintiffs and the class;

(4) Issue preliminary and permanent injunctions requiring defendants to permit plaintiffs to remain housed in their current location;

(5) Award reasonable attorneys' fees and costs, pursuant to 28 U.S.C. § 1988 and any other applicable provisions of federal law; and

(6) Order such other and further relief as the Court deems appropriate.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: October 26, 2017

SIEGEL, YEE & BRUNNER

By: */s/EmilyRose Johns*
EmilyRose Johns

Attorney for Plaintiffs
CLARK SULLIVAN, JAMES BLAIR, TOAN NGUYEN, ARIKA MILES and ADAM BREDENBERG