FARIMAH BROWN, City Attorney, SBN 201227
SAVITH IYENGAR, Deputy City Attorney, SBN 268342
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone:  (510) 981-6998
Facsimile:  (510) 981-6960
siyengar@cityofberkeley.info

Attorneys for Defendant
CITY OF BERKELEY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARK SULLIVAN, JAMES BLAIR, TOAN NGUYEN, ARIKA MILES, and ADAM BREDENBERG,<br><br>            Plaintiffs,<br><br>      vs.<br><br>CITY OF BERKELEY and SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT,<br><br>            Defendants. | No.  3:17-cv-06051-WHA<br><br>DEFENDANT CITY OF BERKELEY'S<br>(1) OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, AND<br>(2) RESPONSE TO QUESTIONS RAISED BY THE COURT<br><br>DATE:  October 31, 2017<br>TIME:   9:00 a.m.<br>CTRM:  8, 19th Flr., San Francisco |

**INTRODUCTION**

The City of Berkeley is faced with two seemingly incompatible realities.  Encampments are illegal under a variety of state and local laws and may create negative health, safety and economic impacts on encampment residents and surrounding neighborhoods and businesses.  Yet in the absence of enough shelter and affordable housing for Berkeley's homeless residents, encampments can provide basic human needs like shelter and community.

The City of Berkeley addresses these realities, raised by this Court during a TRO hearing before the City became a party to this action, below.

First, however, the City must address plaintiffs' motion.  While plaintiffs have moved ostensibly to enjoin both BART and the City, plaintiffs failed to serve the City, and in any event fail to specify what they seek to enjoin the City from doing.

1    Plaintiffs allege "BART police served" a notice on them (Mot. 3), that the notice states
2 certain property "will be removed by BART," and that plaintiffs will suffer harm "if they violate
3 BART's order" (Mot. 4) in light of "BART's treatment of the residents of a neighboring camp . .
4 . on the day following the Court's issuance of the temporary restraining order in this matter"
5 (Mot. 5).  Against the City, plaintiffs allege only that they seek to restrain unspecified "actions of
6 police employed by the City of Berkeley" (*id.*).  In their amended complaint, which plaintiffs
7 have also not served on the City, plaintiffs allege that "BART, with the assistance of the City of
8 Berkeley, intends to evict the peaceful encampment," and that "BART will use the City of
9 Berkeley and the Berkeley police department to enforce the eviction on the FTCftH
10 encampment."  FAC ¶¶ 24, 77.
11    Plaintiffs' motion fails to address how the City's police department's unspecified
12 actions—which could involve simply being present during BART's enforcement of its notice—
13 is anything more than a "speculative inference" insufficient to establish standing for injunctive
14 relief against the City.  *Johnson v. Weinberger*, 851 F.2d 233, 235 (9th Cir. 1988).  For similar
15 reasons, plaintiffs cannot satisfy the preliminary injunction test by showing "serious questions
16 going to the merits" arising from the City's unspecified actions, that these actions will give rise
17 to any "irreparable harm," or how enjoining the City or its police department could be in the
18 public interest.  *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam).
19    The City addresses these issues in Section I of this brief.
20    In Section II, the City provides the information the Court requested during the TRO
21 hearing on October 24, 2017 regarding plaintiffs' encampment and homelessness in general.
22 This information is based on declarations by the City's Deputy City Manager, Director of
23 Health, Housing and Community Services ("HHCS"), Director of Public Works, City Clerk, and
24 a Captain of the Berkeley Police Department, submitted herewith.
25
26
27 ///
28 ///

# I.

# ARGUMENT

***Plaintiffs lack standing to obtain injunctive relief from the City.***  In order to establish standing for injunctive relief, "[t]he plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  A plaintiff lacks standing "when 'speculative inferences' are necessary to establish either injury or the connection between the alleged injury and the act challenged." *Johnson*, 851 F.2d at 235.

Plaintiffs ask this Court to enjoin unspecified "actions" by the City's police department (Mot. 5), and allege in their amended complaint that the City will provide "assistance" to BART (Compl. ¶¶ 24, 77).  Plaintiffs have failed to satisfy their burden to show that the City's "official conduct" – which could involve nothing more than simply being present during BART's operations and providing support to encampment residents – will result in any real and immediate threat of injury to plaintiffs.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  Plaintiffs' motion relies on speculative inferences that cannot confer standing for injunctive relief against the City. *See Johnson*, 851 F.2d at 235; *see also Rizzo v. Goode*, 423 U.S. 362, 372 (1976) (holding that "principles of equity . . . militate heavily against the grant of an injunction [against a police department] except in the most extraordinary circumstances.").

Indeed, despite purporting to seek to enjoin the City, plaintiffs have not even served the City with any papers.  *See* Civ. L-R 7-2; *Seifi v. Mercedes-Benz U.S.A., LLC*, No. 12-CV-05493-TEH, 2015 WL 12952901, at *1 (N.D. Cal. July 29, 2015) (denying motion for failure to serve defendant).

***Plaintiffs cannot satisfy the preliminary injunction test.***  Even if plaintiffs could establish standing against the City, plaintiffs' effort to enjoin unspecified "actions" by the City's police department (and allegations of "assistance" in its amended complaint) fails to satisfy the preliminary injunction test.  In order to justify this "extraordinary remedy" (*Winter v. Natural*

3

1  *Res. Def. Council*, *Inc.*, 555 U.S. 7, 22 (2008)), plaintiffs must make "a threshold showing [of
2  certainty] . . . on each factor" of the test.  *Leiva-Perez*, 640 F.3d at 966.
3       Plaintiffs have made no effort to make this showing against the City.  Plaintiffs allege
4  "BART police served" a notice (Mot. 3), that "BART's order" threatens removal of property
5  (Mot. 4), and that plaintiffs may suffer harm because of "BART's treatment" of the neighboring
6  encampment (Mot. 5).  Plaintiffs have not specified why this Court must restrain "actions of
7  police employed by the City of Berkeley" (*id.*).  Plaintiffs have not specified what conduct by
8  the City might give rise to "serious questions going to the merits."  *Sports Form, Inc. v. United*
9  *Press Int'l, Inc*., 686 F.2d 750, 753 (9th Cir. 1982).  Plaintiffs have not specified what alleged
10 conduct by the City gives rise to any irreparable harm to plaintiffs.  And plaintiffs have not
11 specified how enjoining the City's police department from, e.g., being present during BART's
12 operations, could ever be in the public interest.  *Leiva-Perez*, 640 F.3d at 970.  Plaintiffs have
13 not met the preliminary injunction test.

## II.

## RESPONSE

16 During this Court's TRO hearing on October 24, 2017 – before the City was a party to
17 this action – the Court posed several questions about plaintiffs' encampment and homelessness
18 in Berkeley and Alameda County in general.  The City submits responses to these questions in
19 the declarations of Deputy City Manager Jovan Grogan, Director of HHCS Paul Buddenhagen,
20 Director of Public Works Phillip Harrington, City Clerk Mark Numainville, and Captain Jennifer
21 Louis of the Berkeley Police Department.  The City recounts each of the Court's questions,
22 below, and either quotes from relevant declarations or summarizes information that appears in
23 exhibits to the declarations.

24   **1.   Where do the homeless people come from?**  (TRO Hr'g Tr. 30:18 Oct. 24, 2017.)
25   *See* Declaration of Paul Buddenhagen ("Buddenhagen Decl.") ¶ 3:

26   Reliable data on encampments are lacking, in Berkeley and across the country.
     Anecdotal reports indicate that these residents come from all around the country,
27   with several possibly having been born in the East Bay.  The majority of the
     residents appear to have been together as a group in the East Bay since 2011-2012,
28   during the height of the Occupy movement.  Overall, survey data on homeless

residents in Berkeley suggest that 76% were previously housed in Alameda County before losing their housing.

**2. Are they using drugs, marijuana, alcohol?** (Tr. 30:19.)

*See* Buddenhagen Decl. ¶ 4:

> [A]necdotally, there has been some AOD (alcohol and other drug) use, but I understand that the western encampment has a no drug policy. I believe residents are allowed to use AOD in private, but encampment leadership may evict them if their use becomes problematic or disruptive to the other residents. Apparently, several residents of the encampment formerly on the east side of the BART tracks were evicted from the western encampment for failure to comply with the drug-free policy. That said, drinking and some drug use does appear to occur on site.

The City's response to question three, below, also discusses reports of drug and alcohol use in the context of complaints to the City and calls for service to the City's police department.

**3. What kind of crime is going on there?** (Tr. 30:23.)

The City has received complaints by email regarding encampments in the area that appear to allege criminal activity. *See* Declaration of Deputy City Manager Jovan Grogan ("Grogan Decl."), Exs. A-C. The City has provided copies of email complaints regarding the western parcel, dated between July 11 and October 26, 2017 (Ex. A), the eastern parcel, dated between August 31 and October 26, 2017 (Ex. B), and other communications between July 14 and October 24, 2017 that either reference other encampments or are not complaints (Ex. C). The complaints include demands to remove the encampment or encampments, and express concerns about children's health, safety and welfare due to alleged drug use, violence, public sexual acts, stockpiles of garbage, hazardous bodily wastes, and the lack of public access caused by the encampments. *Id.* Community members have also presented public comment during City Council meetings, including the Council's October 17, 2017 regular meeting. *See* Declaration of City Clerk Mark Numainville, Ex. A (attaching transcript). Most of these comments appear to be by parents of students attending the American International Montessori School at 3339 Martin Luther King Jr. Way, which is near the encampment on the east side of the BART tracks. *Id.*

The City was unable to compile communications to its Online Service Center (3-1-1) and Berkeley City Council members regarding the encampments at this time.

1    The Berkeley Police Department has received at least forty-two calls for service
2    regarding the western and eastern encampments since January 1, 2017.  Declaration of Captain
3    Jennifer A. Louis ("Louis Decl.") ¶¶ 2-6.  Callers and officers have provided indistinct location
4    information regarding this area, making it difficult to compile all calls for service to the area, or
5    to distinguish between calls to one encampment or the other.  Louis Decl. ¶ 2.  Captain Louis has
6    provided a spreadsheet showing the forty-two calls for service (Louis Decl., Ex. A), as well as
7    copies of each of the reports associated with these calls, where prepared (Louis Decl., Ex. B).
8    The City summarizes below relevant calls for service and provides location to the extent
9    possible based on the information that appears in the reports.

| Date | Description | Location |
| --- | --- | --- |
| 1/16 | Report of and Arrest for Sexual Assault (Rape: Victim Unconscious; Assault with Intent to Rape) | Alcatraz Ave. / Adeline St. |
| 2/23 | Report of residents "smoking something that [reporting party ("RP")] thinks is drugs" | Alcatraz Ave. / Adeline St. ("By the 'Here' & 'There'") |
| 2/28 | Report of individual "screaming & throwing trash cans into the street" | Alcatraz Ave. / Adeline St. |
| 3/9 | Report of "male urinating and shaking his penis at traffic" | Adeline St. / Alcatraz Ave. |
| 3/14 | Report of individual "trying to instigate a fight" and "grabbing a pipe to fight" another individual | 63rd St. / Adeline St. |
| 5/5 | Report: "RP is living in the tents where it states 'HERE and THERE'"; "RP's tent was destroyed" by suspect, "took items, and $200 dollars cash" | Adeline St. / MLK Jr. Way |
| 5/8 | Report: suspects "came into RP's tent and hit him with pipes and took items / destroyed others / threw others away"; RP states when the group "started doing drugs and RP declined, RP also notif[ied] PD of the drug use and this is retaliation for RP calling out" | MLK Jr. Way / Adeline St. |
| 5/8 | Report of individual "being chased by a gang" | Adeline St. / Alcatraz Ave. |
| 5/22 | Report of individual with "jeans down to his ankles [ ] in the intersection approaching veh[icle]s" | Adeline St. / Alcatraz Ave. |
| 6/21 | Report of individual "urinating" | Adeline St. / Alcatraz Ave. |
| 6/27 | Report: RP "catcalled aggressively"; individual "was yelling at RP and walking behind her" | Adeline St. / Alcatraz Ave. (individual last seen southbound on Adeline [on] foot) |
| 8/1 | Report: "RP said she found several plastic bottles filled with urine in the area where the tents are set up. RP | 63rd St. / Adeline St. |

| | | |
|---|---|---|
| | said children in the area feel unsafe as the people living in the tents sometimes exhibit 'hostile, threatening behavior', and are sometimes drunk in public." | |
| 8/4 | Report of individual "littering outside the truck" | 63rd St. / MLK Jr. Way (report: "in the park area on the east side of where BART train goes underground") |
| 8/5 | Report of "kitchen set up [block]ing emergency entry door for the BART tracks" | 63rd St. / MLK Jr. Way |
| 8/22 | Report of "[large] group of 8-10 tents w/ppl urinating/defecating and leaving their trash all over the strt"; BPD comment: "encampment apart of FRCFTH, no urinating in public or anything of the sort observed" | 63rd St. (report: "grp is on small patch of grass n/t a preschool") |
| 9/12 | Report of individual "carr[ying] a screwdriver as a weapon" and kicking RP "out of the tent" | 63rd St. / MLK Jr. Way ("RP says on the other side of the tents on the other side of the BART tracks") |
| 9/20 | Report of individual "'swing[ing]' at people at the encampment" | Adeline St. / MLK Jr. Way |
| 9/21 | Report by encampment resident of female "inside the encampment" who "is high, has been smoking crack, is pregnant, and causing a scene"; "RP says [suspect] female is completely naked"; report: "in homeless camp, RP says she can hear male pushing a woman and threatening to choke her out"; "tent city resident and [ ] had two verbal altercations, settled and both parties agreed no further disputing. . . . left the city to go to Oakland" | 63rd St. / MLK Jr. Way ("starting from the west end [ ] along the east side of encampment") |
| 9/22 | Report of smoke visible from RP's 63rd Street address; "RP concerned because it is near redwoods" | 63rd St. / MLK Jr. Way |
| 9/25 | Report of "people being attacked at the homeless camp"; "pulled up in a car and have baseball bats"; "there are 'Milo supporters' who are breaking up the homeless camp" | 63rd St. / Adeline St. |
| 9/27 | Report of individual "in a tent talking to himself, possibly defecated on himself" | Alcatraz Ave. / Adeline St. |
| 3/2 *[out of order]* | Robbery; one suspect "slammed [victim] to the ground from behind"; second suspect "punch[ed] him in the face and [stole] his backpack" | Harmon St. / King St. ("intersection of Harmon/King") |
| 10/6 | Death investigation | MLK Jr. Way / 63rd St. |
| 10/8 | Report of individual who "smokes weed"; report of individual "harassing people at the tent area" | Alcatraz Ave. / Adeline St. |
| 10/8 | Report of individuals "throwing items around"; "yelling / screaming"; individual "destroyed [RP's] tent"; individual "told RP a few hours ago that he was assaulted w/ a bat"; "per RP subj[ ] carries a large pocket knife [ ] is very agitated right now" | Alcatraz Ave. / Adeline St. (report: "close to the BART overpass" |

| Date | Report | Location |
|---|---|---|
| 10/8 | Report of individual "screaming"; "He's inside of a white tent w/a red top on it in the center of all the tents (RP can point out)"; "has also defecated/urinated on himself" | Adeline St. / Alcatraz Ave. |
| 10/9 | Report of two individuals "pushing" and "screaming" | Alcatraz Ave. / Adeline St. (report: "on east [ ] by Montessori school") |
| 10/12 | Report of and arrest for Assault with deadly weapon other than a firearm, exhibit deadly weapon other than firearm, batter with bodily injury; in connection with "male chasing people around with hammer"; victims appear to include residents of west encampment | Adeline St. / Alcatraz Ave. (scene described as "on the n/e quadrant of 63rd St. and Martin Luther King Jr. Way . . . east of the Ashby BART tracks") |
| 10/15 | Report: "RP was yelling that the bf was hurting her dog"; "female heard yelling stay away from my stuff" | Alcatraz Ave. / Adeline St. |
| 10/17 | Report of "open bonfire" "underneath trees" | 63rd St. / MLK Jr. Way |

Captain Louis summarizes these reports as follows:

> In sum, approximately eleven calls relate to arguments or actual violence or weapons. BPD made an arrest in one of those cases. BPD also received one call reporting sexual assault, which resulted in an arrest, two calls reporting theft, and one call regarding a death, which BPD determined to be non-criminal. BPD received eight calls requesting welfare checks on residents of the encampments. The remaining nineteen calls reflect other violations, including violations of the Berkeley Municipal Code, including but not limited to sleeping on sidewalks, setting up tents, starting small cooking fires and usage of drugs by residents.

Louis Decl. ¶ 6.

**4. Have there been deaths or other injuries at the encampment?** (Tr. 30:24-25.)

As noted above, approximately eleven calls for service have related to arguments or actual violence or weapons (resulting in one arrest), one call reported sexual assault (resulting in an arrest), one call involved a non-criminal death, and some calls involved the usage of drugs by residents. *See* Louis Decl. ¶ 6. The table above notes location information to the extent possible for these calls.

**5. What is the sanitation situation?** (Tr. 31:1.)

In his declaration, the City's Director of Public Works explains that the City issued a Facility Permit to an individual on behalf of the organization "Friends of Adeline" for portable toilet facilities (*i.e.*, one ADA toilet, one standard toilet, and one wash station) in a City-owned parking lot at the intersection of Martin Luther King Jr. Way and Alcatraz Avenue. *See* Declaration of Phillip Harrington ("Harrington Decl.") ¶¶ 3, 6, Ex. A (attaching permit); *see also*

Grogan Decl., Ex. D at 15 (showing units at permitted location).  There were several sanitary overflows in the days following installation due to an inadequate service schedule.  Harrington Decl. ¶ 7.  Thereafter, the units were relocated without authorization from their permitted location to a new location within the public right-of-way adjacent to the northbound lanes of Adeline Street, north of and adjacent to the western encampment.  *Id.* at ¶ 8.  The Public Works Department contacted the toilet facilities contractor and requested that the units be returned to their permitted location.  *Id.* at ¶ 9.  Shortly after they were returned, the units were again moved without authorization to the same unpermitted location.  *Id.* at ¶ 10.  The Public Works Department took no further action and the units remain at this location.  *Id.*; *see also* Johns Decl. in Supp. of Pls.' Mot. Prelim. Inj., Ex. D (showing units at current location).

As noted above, the City has also received complaints referencing the sanitation situation at the encampments and its effect on the community.  *See* Grogan Decl., Exs. A-C.

> **6. Are there shelters available in Alameda County that the homeless could go to?**
>    (*Id.* at 31:2-3.)

*See* Buddenhagen Decl. ¶ 5:

> [T]he short answer to this is no.  Alameda County has a severe shortage in shelter beds relative to the number of homeless people.  The County will soon—by January 2018—be filling shelter beds the same way Berkeley does: for high-needs clients assessed by Coordinated Entry (discussed below).  This policy is being developed right now.  A small number of beds may remain outside of this system, but nothing has been finalized.
>
> Berkeley emergency shelter beds are also in extremely short supply.  At last count in January 2017 there were nearly 1,000 homeless people in Berkeley; there are 138 year-round beds for adults without children (which pertains to the western encampment).  Beds can only be accessed through the City's Coordinated Entry System, which assesses people based on their length of time homeless and their level of need, and prioritizes resources for the highest-needs people: those who have been homeless the longest and are most disabled.  This policy is a federal mandate, and it means that even if the right number of beds were available to accommodate everyone in the encampment, not everyone there would qualify for shelter, as there are many disabled, long-term homeless people in Berkeley not living in this encampment.
>
> On any given night, approximately 90-95% of Berkeley shelter beds are occupied.  Most of the remaining vacant beds have been reserved through Coordinated Entry, but if a person who has a bed does not show up, vacant beds are subsequently filled on a first-come-first-served, one-night basis.  People can access by calling 1-866-960-2132 between 7-8 PM and asking if any emergency beds are available for that night.

City and City-contracted staff have visited the encampment to provide services, including support accessing shelter beds, temporary and permanent housing, since the encampment was established.

**7. What is the employment of the people in these encampments?** (Tr. 31:4-7.)

*See* Buddenhagen Decl. ¶ 6:

[A]necdotally, roughly 30% of the residents are on SSI and do not work. Many of the remainder appear to generate income through under-the-table means. We cannot disclose any individual person data.

**8. Where would these homeless people go?** (Tr. 31:12-15.)

*See* Buddenhagen Decl. ¶ 7:

[T]hese residents appear to be committed to their self-governed encampment model and appear to be exploring other relocation options in Berkeley. In general, it is unlikely that this group will leave Berkeley, and it seems unlikely that it will splinter into smaller factions. As mentioned above, the core of the western encampment appears to have been together since the Occupy days.

**9. Current pictures of the site.** (Tr. 32:22-33:4.)

*See* Grogan Decl., Ex. B.

## CONCLUSION

To the extent plaintiffs move this Court to enjoin the City of Berkeley, the City respectfully requests that the Court deny plaintiffs' motion.

Dated:  October 30, 2017                FARIMAH F. BROWN, City Attorney
                                        SAVITH IYENGAR, Deputy City Attorney


                                    By:    /s/  Savith Iyengar
                                        SAVITH IYENGAR

                                        Attorneys for Defendant City of Berkeley