IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARK SULLIVAN, ADAM BREDENBERG, and BENJAMIN ROYER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BERKELEY,<br><br>Defendants. | No. C 17-06051 WHA<br><br>**ORDER RE MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

In this action for violations of constitutional rights, defendant City of Berkeley moves for summary judgment on all of plaintiffs' claims. For the reasons herein, the motion is **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

At all material times, on any given night, nearly one thousand individuals experienced homelessness in Berkeley. Most were unsheltered and living on public streets, sidewalks, and parks. The City of Berkeley received frequent complaints regarding the encampments, including complaints concerning rodents, garbage, and illegal dumping. Businesses claimed that encampments discouraged patronage. Encampments on roadways and medians risked interfering with the visibility of traffic, thereby putting both homeless residents and drivers at risk. Encampments on sidewalks also interfered with access to public facilities and created liability for the City under the Americans with Disabilities Act. For these reasons and more, the City regularly removed homeless encampments located on its property, with the City Manager's Office directing large-scale removals (Williams-Ridley Decl. ¶¶ 3–5, Exh. 1).

At all relevant times, the City Manager's Office had a policy of distributing a written "Public Notice" prior to removing an encampment. The content of these notices evolved over time. Beginning in 2016, the notice listed (1) a distribution date, (2) sections of municipal and penal statutes that an encampment may be violating, (3) a list of services available to the homeless, and (4) instructions on how to find information on Berkeley's housing options. Beginning in December 2017, the notice began to include the following:

> Any property which is left unattended will be handled in accordance with City policy regarding temporary storage of unattended property. Individuals who wish to reclaim their property may contact 311 Customer Service Center during regular business hours (Monday–Friday 8:00 AM to 5:00 PM): (510) 981-2489.

Since at least March 2018, the notice has also stated: "Alternatively, information regarding retrieval of unattended property is available in the lobby of the Berkeley Civic Center, 2180 Milvia Street, Berkeley, during regular business hours." The notice has never explained precisely what types of unattended property would be stored or where it would be stored. Nor did it ever contain the date upon which the City would return to enforce the encampment's removal. The notice instead directed homeless residents to move immediately (Hynes Decl. ¶ 6; Slimick Dep. 13:2–27:2; Williams-Ridley Dep. 51:22–52:9; Johns Decl. Exh. C).

The City had a general policy of distributing the written notice at least 72 hours prior to the removal of an encampment, although less notice was given where an immediate health or safety risk was implicated. City employees posted the notices on unoccupied tents and on nearby telephone poles or other available surfaces. Some notices were torn down but plaintiffs always received some amount of prior notice that their encampment would be the subject of an enforcement action (Hynes Decl. ¶¶ 6–8; Slimick Dep. 27:19–31:2; Zint Dep. 132:20–23).

The City also had a policy regarding the storage of unattended property collected during the removal of homeless encampments. Under the policy revised in 2006, City employees stored unattended property for 14 or 90 days depending on the property's value. The policy directed employees to keep together all property collected from the same location, to bag any loose items, and to fill out a storage tag. The storage tag included the date and location of the pickup, the staff name or employee number, and a notation indicating whether to store the

property for 14 or 90 days. One copy of the tag stayed with the property and another copy went into a binder maintained by a supervisor. The policy also provided that the tag be faxed to the City's Mental Health division, which division coordinated retrieval of property with the public. "Representatives" of the property's owner could retrieve it on their behalf, which property the City stored at the Transfer Station on Second Street (Yavneh Decl. ¶¶ 3–11, Exh. 1; Hurtado Decl. ¶¶ 4–8).

Under this policy, the municipal homeless outreach worker, Eve Ahmed, coordinated the retrieval of property. When Ahmed or her staff received an inquiry from the public about missing property, they would cross check the provided information with the information on the storage tags. If the information matched, Ahmed would make an appointment to meet at the City's storage container on Second Street. Ahmed regularly drove people who lacked transportation to the storage container, even when the tags in the binder did not indicate a match, so that the person could check for their property. If anyone complained that their property had been damaged or lost, they received a claim form to seek reimbursement from the City (Yavneh Decl. ¶¶ 3–11; Ahmed Decl. ¶¶ 5–11).

In June 2017, the City revised its policies and practices with respect to the collection and storage of unattended property and memorialized the changes in Administrative Regulation 10.1 (AR 10.1). During an enforcement action, it provided occupied encampments with "a reasonable time to remove their property, as determined by the Berkeley Police Department." AR 10.1 stated that unattended property removed by the City would be held for at least 14 days. The policy required property to be held for longer if it had an apparent value of one hundred dollars or more or if the items appeared usable for shelter. Unattended property that was "clearly refuse or garbage," however, would be disposed of immediately. City staff were directed to photograph unattended property before removal, regardless of whether the property would be disposed of or stored. Moreover, when removing property, the City had to utilize an inventory form to list the collected property either as individual items or by the quantity of bags removed. Items of value had to be inventoried and the inventory form noted whether the item was stored or disposed of. AR 10.1 also required items to be "secured in a locked, covered,

3

storage container located at the Corporation Yard at 1326 Allston Way" (Hurtado Decl. ¶¶ 14–17, Exh. 6).

*       *       *

In October 2016, plaintiff Benjamin Royer joined a homeless community in Berkeley called "First They Came for the Homeless" or FTCftH. That winter, FTCftH started the "Poor Tour," whereby they camped in visible places to demonstrate the plight of the homeless and "make a statement" about their treatment by the City. While he lived with FTCftH, Royer experienced nine encampment removals. During a December 2016 removal, the City collected certain of Royer's property, including a tarp, sleeping pad and bag, clothing, and a therapy tool. At that time, the written notice distributed by the City did not inform Royer how to retrieve his property. And, because Royer did not have a cell phone, he could not call 311 to try and find information about collecting his property (Dkt. No. 121 ¶¶ 7–8; Royer Dep. 94:24–99:20).

Plaintiff Clark Sullivan, a homeless member of FTCftH since November 2016, experienced seven encampment removals that winter. During two incidents, the City seized Sullivan's tent and a suitcase containing clothing, respectively. Although he eventually retrieved the suitcase through the assistance of other community members, the suitcase was empty. He never retrieved the tent (Dkt. No. 122 ¶¶ 3–13; Sullivan Dep. 75:10–76:6).

Plaintiff Adam Bredenberg, a homeless member of FTCftH between October 2016 and February 2018, experienced five encampment removals while living with the group, during which he lost certain communal property such as pots and pans for cooking (Dkt. No. 122 ¶¶ 3–24).

FTCftH received less than 24-hours notice before certain of these removals and received less than 48-hours notice with respect to others. In each instance, however, the group received some notice (Zint Dep. 132:20–23).

Plaintiffs filed this civil action *pro se* in late 2017. Since the filing of this lawsuit, FTCftH's encampment has not been the subject of an enforcement action. A September 2018 order granted in part and denied in part plaintiffs' motion for class certification, certifying a class of all homeless individuals in Berkeley who are now subject to the City's policies and

4

practices of property collection, storage and disposal, with respect to Royer's Fourth and Fourteenth Amendment claims for injunctive and declaratory relief. The September 2018 order denied plaintiffs' request to certify their First Amendment retaliation claim. The City now moves for summary judgment on all of plaintiffs' claims (Dkt. Nos. 1, 133, 139). This order follows full briefing and oral argument. Trial is set to begin on May 6.

**ANALYSIS**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

1. **FOURTH AND FOURTEENTH AMENDMENT.**

Under the Fourteenth Amendment, homeless individuals are entitled to meaningful notice and an opportunity to be heard before their unabandoned property is seized and destroyed. *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012). Due process is satisfied where law enforcement "take[s] reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its return." *Ibid.* (citation omitted). A "seizure" of property under the Fourth Amendment occurs when there is "some meaningful interference with an individual's possessory interests in that property." *Id*. at 1027 (citation omitted). A seizure is deemed unreasonable if the government's legitimate interest in the seizure does not outweigh the individual's interest in the property seized. *Id*. at 1030.

Royer represents a class of all homeless individuals in Berkeley who are subject to the City's collection, storage, and disposal policies and practices, on behalf of whom he seeks declaratory and injunctive relief as to his Fourth and Fourteenth Amendment claims. This order concludes that plaintiffs have failed to raise a triable issue as to whether the City's policies and practices regarding the removal and storage of unattended (and unabandoned) property at homeless encampments meet constitutional requirements, as now explained.

The City generally provides written notice at least 72 hours prior to removing a homeless encampment, although less notice is provided when health and safety is immediately at stake and more notice is provided when feasible. The notice informs homeless residents that they are violating municipal or penal statutes and that they must leave the area. The notice also explains how individuals may reclaim any property collected by the City. Once City staff comes to enforce the notice, occupied encampments are given reasonable time to move their belongings before anything is taken. As to any unattended property collected, staff will inventory the items before placing them in a secured storage container at the Corporation Yard, where property is kept for at least 14 days (or longer if it has a high apparent resale value or is usable for shelter). The City disposes of items that are clearly "refuse or garbage," or which are soiled, moldy, or damp. Regardless of whether disposed of or stored, employees must photograph property before it is removed (Hurtado Decl. Exh. 6; Johns Decl. Exh. C; Slimick Dep. 29:20–30:2).

Plaintiffs raise three arguments as to why the City's policy is constitutionally deficient on its face. None has merit.

*First*, plaintiffs argue that even if the City provides 72-hours' notice that a removal action is imminent, the City must also disclose the precise date and time at which it will return to enforce the encampment's removal. In support, plaintiffs cite *Hooper v. City of Seattle*, No. 17-cv-0077, 2017 WL 591112 at *6 (W.D. Wash. Feb. 14, 2017) (Chief Judge Ricardo Martinez). There, the district court preliminarily found that Seattle's policy for removing homeless encampments did not violate the Fourth and Fourteenth Amendments where Seattle "provide[d] notice of the particular dates scheduled for any clean-up (rather than merely a 72-hour deadline for removing property)." *Hooper* did not hold, however, that the specifics of Seattle's notice were constitutionally required.

And, notably, plaintiffs cite no evidence suggesting that such a policy would have prevented the City's allegedly erroneous seizure of unabandoned property. Instead, the undisputed facts demonstrate that even when homeless encampments received notice that they needed to move, they remained in place until the police returned to force them out. Members of FTCftH in particular refused to pack up upon receiving notice because they wanted "to be

6

kicked out, to be removed." And, as described below, other homeless encampments remained in place for weeks after being told they needed to change locations (Zint Dep. 132:20–133:7; Bredenberg Dep. 98:2–20; Rodriques Decl. ¶¶ 2–5; Schofield Decl. ¶¶ 2–8).

*Second*, plaintiffs argue that the City's written notice to homeless encampments must explain "where a person can go to retrieve their property or when they can retrieve it." Specifically, plaintiffs argue, the notice must state the address of the storage facility where the property has been brought. This order disagrees. "[D]ue process requires law enforcement 'to take reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its return.' " *Lavan*, 693 F.3d at 1032 (quoting *City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999)). Here, since at least March 2018, the notice has explained who to call or where to go if someone wants to reclaim their property. From there, employees direct them to the appropriate City agency, which agency in turn scheduls an appointment to retrieve the property. This is sufficient to allow property owners to "pursue available remedies for its return."

*Third*, and again relying on the district court's decision in *Hooper*, 2017 WL 591112 at *6, plaintiffs argue that the policy is unconstitutional because it does not require the City to (1) use a storage facility accessible by public transportation, or (2) deliver stored property to its owner within one business day. Moreover, plaintiffs argue, the policy requires homeless residents to engage in a process over the phone (a resource homeless individuals may not have access to). This order again disagrees. The undisputed evidence shows that homeless residents no longer need a phone to retrieve their belongings because they are notified that they can obtain information regarding the retrieval of their property by visiting the Berkeley Civic Center. Plaintiffs also cite no evidence to support their claim that the Corporation Yard at 1326 Allston Way is *not* accessible by public transportation. Plaintiffs' evidence instead demonstrates that a local bus *does* in fact stop within a few blocks of that location (Cheema Decl. ¶ 16).[1]

---

[1] Plaintiffs also complain that Berkeley police do not have a "bulletin" on the rights of homeless individuals to retain or retrieve their property, but wholly fails to explain why such "bulletins" are necessary in light of the City's policies discussed herein.

7

Next, plaintiffs raise a scattershot of arguments as to why, irregardless of the constitutionality of the City's policies and procedures, the application of those policies in practice violates the Fourth and Fourteenth Amendments. This order rejects each argument in turn.

*First*, plaintiffs' contention that the City fails to prominently post written notices at sites where property is removed is unsupported by the record. The undisputed evidence is that notices are posted on occupied tents, telephone poles, and other available surfaces nearby. In wet weather, the notices would be placed in plastic sleeves. And, although Royer states that he has "never seen the City of Berkeley post notices on a building or structure near [his] encampment before," he and other members of FTCftH acknowledge that they did, in fact, receive notice prior to encampment removals and Royer further acknowledges that in one instance notices were posted on cement pillars nearby (Royer Decl. ¶¶ 9–12; Hynes Decl. ¶ 7; Zint Dep. 126:20–132:23; Royer Dep. 71:9–19, 102:7–107:17).

*Second*, plaintiffs argue that although the City's policy is to provide 72-hours' notice before forcing an encampment to move, there are instances where the homeless receive less than 24-hours' notice. Plaintiffs cite the declaration of Michelle Lot, a homeless Berkeley resident who states that in October 2018 the police required her to move within 24 hours of providing notice. And, in December 2018, "with no warning, the police came in SWAT gear and forced [her] to move," giving her two hours to pack up her belongings. Lot's declaration fails to establish, however, that this resulted in the seizure of her property. Rather, her declaration indicates that she was given sufficient time to pack up and move "all [her] belongings." Similarly, although Royer describes an instance in which he was given less than 24-hours notice to move his belongings, he nevertheless had time to pack all of his belongings in a wheelchair (Lot Decl. ¶¶ 6–17; Royer Decl. ¶ 11).

Plaintiffs also cite various public notices attached to the declaration of Attorney EmilyRose Johns to argue that they received less than 24-hours' notice before the removal of FTCftH's encampment on October 7, 2016, October 18, 2016, November 7, 2016, and January 6, 2017, less than 48-hours' notice on December 21, 2016, to move from the median, and same-

8

day notice to move from the lawn in front of City Hall. As the City points out, however, while plaintiffs have submitted all of the notices produced by the City in discovery, there is nothing in the record to indicate that this is the full set of notices provided to FTCftH. Indeed, the face of the documents themselves indicates that the set is not complete. For example, the notices dated December 2, 2015, and October 17, 2016, are both labeled "SECOND PUBLIC NOTICE," yet the first notices are missing. Moreover, even if less than 24-hours' notice to leave a public space was provided on certain occasions, plaintiffs have failed to raise a triable issue as to whether this would violate due process when the encampment did, in fact, receive notice and a reasonable opportunity to pack up their belongings before the City collected any remaining unattended property.

*Third*, plaintiffs argue that the City engages in conduct prohibited by *Lavan*, 693 F.3d at 1032–33, by summarily destroying unabandoned property as "trash" when it clears encampments. According to the declaration of Frank Dietderich, Berkeley police notified him that he needed to move three structures that he had built in the roadway. Dietderich says that when the police and Department of Public Works returned three days later, he had not yet been able to move the structures, resulting in City workers crushing them, placed them in a garbage truck, and destroyed various personal items in the process. Kelley Webinger, who lived nearby at the same encampment, acknowledges that she also received notice that she needed to move the shelter she had built on the sidewalk. When the police returned three days later, the police told her "to grab what [she] wanted to keep and move it across the street." "Once [she] did," the City destroyed the rest of her belongings. She wanted to return to grab more items from her shelter but claims Officer Veronica Rodrigues physically prevented her from doing so (Dietderich Decl. ¶¶ 5–16; Webinger Decl. ¶¶ 5–19).

Webinger and Dietderich's testimony need not be adopted to the extent it is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). As shown by video of their interactions with Berkeley police, Webinger and Dietderich first received notice that they needed to move their encampment nearly a month prior to the enforcement action. At that time, Webinger told Officer Rodriques that she

9

intended to "downsize" and get rid of items surrounding her shelter. Police told Webinger and Dietderich that anything they did not want could be left behind and would be taken care of by the City. Over the next three and a half weeks, police returned multiple times to warn Webinger and Dietderich that they needed to move. When police and City staff returned to finally require them to leave, Webinger and Dietderich received additional time to move their belongings before the City cleared out the encampment. When Officer Rodrigues arrived on the scene, Webinger acknowledged that "she got all the stuff she needed" from her shelter. At no point does Officer Rodrigues prevent Webinger from grabbing more items. Webinger also told Officer Rodriques that a structure left behind by Dietderich had been vandalized. Dietderich had since left the immediate area and did not return when Berkeley police began to move it. Nothing in Dietderich's declaration indicates that he told the officers that he intended to return for more property (Schofield Decl. ¶¶ 2–8, Exhs. 1–2; Rodrigues Decl. ¶¶ 2–6, Exhs. 1–2).

In connection with a different removal action six months earlier, homeless resident Patricia Moore explains that she had heard "for a while" that the City would be coming to clear her encampment. When the City arrived and began to clear an encampment a few streets over, Moore "did not move [her] property until the day that the City started to clear [her] shelter." Everything she could not carry away was placed into a garbage pile. Moore does not say that she informed the police that she wanted more time to remove items from her shelter or that she otherwise indicated to City employees that her property had not been abandoned or that she wanted help. She acknowledges that nearby businesses had started to complain about the encampment because of the amount of trash. The City had not been by to pick up garbage for at least a month (Moore Decl. ¶¶ 6–13).

These incidents fail to raise a triable issue as to whether the City has a practice of summarily destroying unabandoned property in violation of the Fourth and Fourteenth Amendments. The circumstances and holding of our court of appeals' decision in *Lavan* bear repeating. There, the plaintiffs were homeless individuals who temporarily left their personal possessions on public sidewalks while attending to necessary tasks such as eating, showering, and using restrooms. *Lavan*, 693 F.3d at 1025. Although the plaintiffs had not abandoned their

10

property, employees of the City of Los Angeles seized and summarily destroyed the plaintiffs' possessions. *Ibid*. Importantly, Los Angeles "did not have a good-faith belief that [the plaintiffs'] possessions were abandoned when it destroyed them." *Ibid*. And, while not addressing the scope of the preliminary injunction at issue, our court of appeals noted that the district court had permitted Los Angeles to "lawfully seize and detain property, as well as remove hazardous debris and other trash." *Ibid.* (citing *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1020 (C.D. Cal. 2011)). The decision held that "collecting and destroying [the plaintiffs'] property on the spot" constituted an unreasonable seizure under the Fourth Amendment and that Los Angeles violated the Fourteenth Amendment when it "failed to provide any notice or opportunity to be heard" before seizing and destroying the plaintiffs' property. *Lavan* made clear that the decision did not "concern any purported right to use public sidewalks as personal storage facilities." *Id.* at 1030–32.

Here, Moore, Webinger and Dietderich all had prior notice that they needed to move their belongings from public roads and sidewalks. Although Moore does not say exactly how long she knew that the City would be forcing them to move, the undisputed facts demonstrate that Webinger and Dietderich had nearly a month to comply with the City's directives. Moreover, the record demonstrates that the City had an objectively reasonable basis to believe that the property left behind by these three individuals was wholly abandoned rather than temporarily unattended. Webinger and Dietderich were specifically informed that they should take what they wanted to keep and could leave behind any trash for disposal. Webinger told Officer Rodrigues that she had taken what she needed and that Dietderich's remaining structure had been vandalized. Moore acknowledges that her encampment (which spanned multiple streets) had a large amount of trash. Nothing in the record indicates that the property she lost, or any other items discarded by the City that day, appeared such that a reasonable person would have believed it to be temporarily unattended rather than abandoned.

There is no genuine issue of material fact that the City's actions were reasonable. These individuals knew that the City would not allow them to keep their property on public property and were on notice that the police would come and require them to move. Still, they did not

11

timely move the items they wished to keep. To be sure, "'[t]he government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking.'" *Id.* at 1032 (quoting *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008)). The latter happened here. The Constitution does not prohibit the City from removing items stored on its property where a homeless resident, if given an indefinite amount of time, would eventually return to collect them. Moreover, the City has a legitimate interest in enforcing its penal and municipal statutes and in removing unsafe or hazardous conditions from its public spaces. In balancing the invasion of these individuals' possessory interests in their personal belongings against the government's interest in clearing out items they left behind, plaintiffs fail to raise a triable issue as to whether the City's seized items unreasonably. Under the circumstances described by plaintiffs' evidence, the City's seizure and destruction of the items was reasonable as a matter of law.

*Fourth*, plaintiffs argue that the City seizes people's property even when they are present to claim it. Plaintiffs point to a three-minute clip of a 34-minute video where a FTCftH supporter asked the police and Department of Public Works not to take certain property from the encampment because a van was on its way. For the first 20 minutes of that same video, however, the police asked members of the encampment to pack up and leave, to no avail. Rather than pack their belongings, most stood around and criticized the police. To the extent certain individuals present actively packed, those items were not seized by the City. Under these circumstances, plaintiffs may not sit on their hands and then be heard to complain when the City enforces its laws and, in so doing, places their property into storage for collection at a later date.

Bredenberg's declaration also fails to raise a triable issue. He recalls a single instance where a police offer came to take a nearby bag of clothing that had been donated to the camp. Although Bredenberg explained that the clothes belonged to FTCftH, the officer took the clothes and put it in the back of his truck (Bredenberg Decl. ¶¶ 23–24). But even if the City *had* failed to give Bredenberg reasonable notice that it would seize the items, and further assuming that Bredenberg's comments to the officer constituted a claim of ownership over the clothing,

this lone incident is insufficient to raise a triable issue as to the City's liability under the Fourth and Fourteenth Amendments. At most, this would constitute an individual incident of unconstitutional action by a non-policymaking employee that is insufficient to establish *Monell* liability. *See McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000).

*Fifth*, plaintiffs complain that police threaten to take residents' property if the police are forced to assist with packing or if a resident packs too slowly. They further assert that the police should do more to identify the owners of unattended items that are placed into storage. The enforcement actions described in plaintiffs' deposition testimony and declarations and captured by video, however, do not raise a triable issue as to whether the City has a practice of unconstitutionally seizing momentarily unattended property. To repeat, the City has a legitimate interest in enforcing its penal and municipal codes. FTCftH always received notice in advance of enforcement actions. As did Webinger, Moore and Dietderich. For all that can be gleaned from the record, the encampments had sufficient notice to move yet declined to do so until they were forced out by the police. In those circumstances, members are essentially given the option of moving their items away from public property to avoid seizure or retrieving them post-seizure. The City's removal of unattended items for placement into storage (or its disposal of items reasonably believed to be abandoned or trash) in these instances does not violate the Fourth or the Fourteenth Amendments. Otherwise, the City would never be able to enforce its laws or clear entrenched encampments that block public spaces without running afoul of the Constitution (*see* Johns Decl. Exhs. P–V; Bredenberg Dep. 98:2–20; Zint Dep. 132:24–133:7).[2]

*Sixth*, plaintiffs argue that the City commingles homeless residents' property with garbage and otherwise fails to store property in a way that prevents damage. In his deposition, Bredenberg described one instance in which he observed the City place a tent into the back of a

---

[2] Plaintiffs cite Exhibit P as demonstrating that the City physically prevents residents from keeping belongings they want or need. Yet the man in the video who is prevented from accessing the Department of Public Works truck had been present when the City gave notice that the encampment needed to leave. When asked whether "any of this stuff belong[ed] to [him]," he said no. He instead came back nearly 30 minutes later and tried to access the Department of Public Works truck as it prepared to drive away (*see* Johns Decl. Exh. P at 5:25). Plaintiffs also cite Exhibit U, a video in which a man states that his tent was taken while he was moving other belongings (*see* Johns Decl. Exh. U at 28:37). Because this statement is offered for the truth of the matter asserted and no exception to the hearsay rule applies, the City's objection as to this portion of the video is **SUSTAINED**.

13

truck before "drop[ping] heavy objects on top of it in a way that snapped the poles of the tent." (Bredenberg Dep. 102:14–104:18). During Royer's deposition, he claimed at first to have observed the City commingling garbage with collected property but shortly thereafter admitted that he had never approached a City truck because he "was focused on trying to salvage [his] own property" (Royer Dep. 154:14–155:17). Again, Bredenberg's lone observation would, at most, constitute an individual incident of unconstitutional action by a non-policymaking employee that is insufficient to establish *Monell* liability. *See McDade*, 223 F.3d at 1141.

*Seventh*, plaintiffs' claim that the City "rarely" stores any property from "large-scale" encampment removals is without merit under the current record. On the one hand, plaintiffs reference a set of notices provided to homeless residents prior to encampment removals. On the other hand, plaintiffs merely cite to a set of "inventory forms" produced by the City. Because there is no matching inventory form for each public notice, plaintiffs argue that the City did not store homeless residents' property following the removal of encampments. This argument does not persuade and fails to raise a triable issue of material fact. The whole point of providing homeless residents with notice is to give them an opportunity to remove their belongings and avoid its collection and storage by the City. Plaintiffs' exercise could very well demonstrate the effectiveness of the notices rather than the City's failure to store property.

In sum, taking plaintiffs' evidence as true (except to the extent blatantly contradicted by the indisputable record) and drawing all reasonable inferences in their favor, plaintiffs have failed to raise a triable issue on the Fourth and Fourteenth Amendment claims for declaratory and injunctive relief on behalf of the class. The City's motion for summary judgment on these claims is **GRANTED**.

### 2. INDIVIDUAL DAMAGES CLAIMS.

Although the class-wide claims under the Fourth and Fourteenth Amendments only seek declaratory and injunctive relief, the individual plaintiffs also seek to recover damages for the City's alleged violations of their Fourth and Fourteenth Amendment rights. Specifically, Royer claims that on December 2, 2016, the City collected several items of his property, including a tarp, sleeping pad and bag, clothing, and a therapy tool. During an enforcement action on

November 17, 2016, Sullivan claims that the City seized his tent when he went to get a cup of coffee. And, on December 21, 2016, the City took a suitcase containing his clothes. Bredenberg did not lose any personal items. Rather, he claims to have lost property that he shared communally with other members of FTCftH.

For the same reasons set forth above, there is no genuine issue of material fact that the City's actions were reasonable under the Fourth Amendment. Assuming for purposes of this order that the City did collect the property plaintiffs' claim to have lost, plaintiffs knew in advance of each enforcement action that the City would not permit them to stay with their belongings on public property. Still, they did not timely move the items they wished to keep and there is no evidence to suggest the items were summarily destroyed. Balancing the invasion of plaintiffs' possessory interests in their personal belongings against the City's interests in enforcing its penal and municipal statutes and removing unsafe or hazardous conditions from its public spaces, plaintiffs have failed to raise a triable issue as to whether the City's seizure of their items was unreasonable. The City's motion for summary judgment on plaintiffs' individual Fourth Amendment claims is **GRANTED**.

As to plaintiffs' Fourteenth Amendment claims, however, the notice distributed by the City prior to the November and December 2016 enforcement actions did not provide any information as to how residents could retrieve their seized property. While the City cites evidence indicating that certain community members knew that Eve Ahmed, a social worker with the City, was "the go-to person" for retrieval of property at the time, plaintiffs cite evidence indicating that they either lacked information as to how to obtain their property or reached dead ends when they attempted to do so (Zint Dep. 189:6–18; Brust Dep. 32:14–16; Bredenberg Dep. 44:11–45:3). A triable issue therefore remains as to whether the City provided plaintiffs with sufficient information such that they had the ability the reclaim their property before its destruction at the end of the storage period. A triable issue also remains regarding the extent to which (if at all) plaintiffs' loss of property resulted from any actions by FTCftH's supporters.

Finally, this order disagrees with defendants that plaintiffs' Section 1983 claims are barred because they did not avail themselves of a state tort remedy. "The availability of a state

tort remedy does not bar due process claims brought under section 1983 in cases where a plaintiff is challenging an established state procedure." *Sanders v. Kennedy*, 794 F.2d 478, 482 (9th Cir. 1986). Because the City's failure to provide sufficient notice under its policy did not involve "random and unauthorized acts," the existence of a state-law tort remedy does not bar plaintiffs' Fourteenth Amendment claims. *Ibid*. The City's motion for summary judgment on plaintiffs' Fourteenth Amendment claims for damages is **DENIED**.

### 3. FIRST AMENDMENT RETALIATION.

Pursuant to Section 1983 and *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), plaintiffs also contend that the City targeted their encampment for removal in retaliation for their exercise of their First Amendment rights. "In order to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that 'by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct.'" *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (citation omitted). Courts consider "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Ibid*. (citation omitted). A plaintiff must "prove the elements of retaliatory animus as the cause of injury," with causation being "understood to be but-for causation." *Hartman v. Moore*, 547 U.S. 250, 260 (2006).

Moreover, for a municipality to be liable under Section 1983, there must have been an unconstitutional action taken due to governmental custom or implementation or execution of a policy, regulation or decision adopted by the municipality. The policy or custom must have been adopted by the municipality's lawmakers or by "those whose edicts or acts may fairly be said to represent official policy." A municipality cannot be held liable merely because it employs a tortfeasor. *Monell*, 436 U.S. at 690–91, 694. A municipality may be held liable if it is "obvious" that specific employees need "more or different training" and that the failure to do so was "so likely to result in the violation of constitutional rights[,] that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

16

The City first argues that plaintiffs have not shown they engaged in protected speech, arguing that "camping" is not a form of First Amendment expression because plaintiffs merely seek to immunize unlawful behavior (lodging on public property without permission) by calling it a "protest." As to Bredenberg, this argument ignores that he spoke at Berkeley City Council meetings, wrote an "Op-ed," read a Bible verse to the City's code enforcement officer, and drew "abstract images" on the sidewalk. As to all plaintiffs, the City's argument ignores that its own declarations indicate that its employees knew that a group of individuals called themselves "First They Came for the Homeless," that signs displayed the name at the encampment, and that representatives of FTCftH had asked the City for land and services. Berkeley police also understood that members of FTCftH "represented it as a 'protest' encampment related to concerns about homelessness" and referred to the group by name in police reports as "creat[ing] a disruptive environment to the community" (Williams-Ridley Decl. ¶ 6; Ahmed Decl. ¶ 14; Schofield Decl. ¶ 5, Exh. 2; Rateaver Decl. ¶ 5; Montgomery Decl. ¶ 4).[3]

The City next argues that plaintiffs have failed to raise a triable issue with respect to causation. This order disagrees. Although the City claims that it would have enforced the anti-lodging laws against plaintiffs even if City officials had known of the group's political views, it remains disputed as to whether the City selectively enforced these laws against FTCftH (and against plaintiffs as a result). It is undisputed that the City cleared FTCftH's encampment at least 12 times in three months while leaving other encampments in place (Williams-Ridley Decl. ¶ 8; Moore Decl. ¶ 4). Moreover, the Berkeley police's operation plans included the specific objective of "deter[ing]" FTCftH "from establishing an illegal encampment on City property" (Johns Decl. Exh. CC) While the City argues that the reason for this disparate treatment was FTCftH's decision to camp in more disruptive locations, the resolution of this question requires the weighing of evidence which must be accomplished by the trier of fact.

---

[3] The City argues that plaintiffs were not all present for every enforcement action, yet concedes that each was present on numerous occasions when the City removed their encampment.

17

Defendants' motion for summary judgment on plaintiffs' individual First Amendment retaliation claims is accordingly **DENIED**.[4]

    **4.**     **REMAINING EVIDENTIARY OBJECTIONS.**

The City objects to numerous additional items of evidence, including various exhibits to the Declaration of Attorney EmilyRose Johns, paragraph 16 of the declaration of Boona Cheema, and news articles referenced in a footnote of plaintiffs' opposition brief. Because consideration of this evidence would not change the outcome of this order, the objection is **OVERRULED AS MOOT** (except to the extent already ruled on above).

### CONCLUSION

To the extent stated above, the City's motion for summary judgment is **GRANTED**. The motion is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated: April 19, 2019.

    WILLIAM ALSUP
    UNITED STATES DISTRICT JUDGE

---

[4] The City objects to the admission of the police operation plans on the grounds of hearsay, lack of authentication, and relevance. These objections are **OVERRULED**. This is the City's own document that it produced in discovery. It is therefore clearly relevant, is the admission of a party opponent, and is deemed authenticated. *See Orr v. Bank of America*, 285 F.3d 764, 777 n.20 (9th Cir. 2002).